IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA            Case No. 8:22-cr-00114-WFJ-NHA-1

vs.

MICHELLE LIPINSKI,

_____/

## DEFENDANT'S AMENDED SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD DEPARTURE AND VARIANCE

COMES NOW, Defendant, Michelle Lipinski, by and through her undersigned attorney, submits this sentencing memorandum to assist the Court in resolving certain sentencing issues and in imposing a sentence. The sentencing request contained herein calls for the imposition of a sentence that is not greater than necessary and is sufficient to achieve the purposes enumerated in 18 U.S.C § 3553 (a). The nature of Michelle Lipinski's role in the offense, her characteristics, cooperation, physical/mental condition, and the need for the sentence imposed provide a basis for downward variance. A sentence suggested by the Guidelines would be greater than necessary to accomplish the goals of §3553 (a). As grounds in support of this Motion for Downward Variance, Michelle Lipinski shows as follows:

## I.      Procedural Background

On March 23, 2022, the Government filed a one-count Information in the Middle District of Florida charging Michelle Lipinski with one count of Conspiracy to Distribute a Mixture of Fentanyl and Methamphetamine Resulting

1

in Serious Bodily Injury, in violation of 21 U.S.C.§ 846 and 841(b)(1)(C). On August 11, 2022, Lipinski entered a guilty plea to the one count of the Information. Following her guilty plea, Lipinski was placed on pretrial supervision. While on pretrial release, Lipinski continued to provide cooperation to the Government. In addition to her cooperation, Lipinski has complied with all conditions of her release without any violations. As a result of her cooperation, all co-defendants resolved their cases with guilty pleas.

**II.**    **Guideline Range and Motion for Downward Departure**

Pursuant to the plea agreement, Michelle Lipinski is subject to a maximum sentence of twenty (20) years to life imprisonment and a fine of $1,000,000. Ms. Lipinski is eligible for a minimum of three (3) years of supervised release and a special assessment of $100 per felony count. The Presentence Investigation Report ("PSIR") assesses Lipinski at a base level offense of 38 with an increase of 2 levels based on the specific offense characteristics, resulting in an adjusted offense level of 40. The Defendant received two additional 2 level upward adjustments for her role in the offense (abuse of a position of public trust), giving her a total adjusted offense level of 42 (PSIR ¶ 34). After the respective two and one-level reductions for Acceptance of Responsibility, Lipinski's total offense level is 39 in the criminal history category of I, resulting in a guideline imprisonment range of 262 months to 327 months (PSIR ¶ 85). The Government will be filing a motion for a downward departure pursuant to USSG 5k1.1. On the Government's motion, this Court has

authority to impose a sentence below the minimum of 20 years to reflect Lipinski's substantial assistance and other factors set forth by the Sentencing Commission. 18 U.S.C § 3553 (e). When considering the Government's motion in light of §3553 (a), a variance below the minimum of twenty (20) years and below the advisory guideline range with minimal incarceration is appropriate.

### III.   <u>Analysis of Relevant 18 U.S.C. §3553 (a) Factors</u>

**A. The Nature of the Offense and the Characteristics of the Defendant § 3553 (a)(1):**

This Court is given broad discretion to consider the nature and circumstances of the offense and the history and characteristics of the defendant when determining a reasonable sentence. *Gall v. United States*, 552 U.S. 38 (2007). In as much, the "punishment should fit the offender and not merely the crime." *Pepper v. United States*, 131 S.Ct. 1229, 1240 (2011). Although Lipinski committed a serious offense, there are many mitigating factors that warrant a variance and/or departure from the Guidelines.

1. <u>History and characteristics of the Defendant</u>

   a. *Personal History*

Michelle Lipinski was born in Sarasota, Florida to Thomas and Joan Lipinski. She has no significant criminal history. Lipinski is one of three siblings and enjoys a close relationship with her parents, brothers, and extended family. Despite her current legal situation and the effect it has had on them, her family still supports her. (Exhibit 1). Lipinski has suffered from

mental health, medical, and physical illness her entire life. Her conditions impair her ability to function and require constant care, which she is receiving from many medical professionals.

Lipinski has struggled with learning, social, and cognitive impairment. Unbeknownst to Lipinski, her struggles were related to autism spectrum disorder (ASD) which went undiagnosed. In her younger years, Lipinski had trouble focusing, understanding classroom direction, meeting new people, and keeping friendships. She was diagnosed with attention deficit hyperactivity disorder (ADHD), prescribed Adderall, and put on an Individualized Education Program (IEP). Behavioral and psychological patterns had not been evident just yet to her doctor. They did not seek consistent psychiatric care as they believed that a proper diagnosis was given and at least somewhat maintained with ADHD medication. Learning was difficult as she struggled in school even with accommodations. Socially, Lipinski had communication issues which inhibited her ability to keep and maintain relationships. Her issues made her a target of bullying and harassment. Despite moving from state to state due to her father's employment, Lipinski graduated from high school and eventually received a technical license in phlebotomy, a CNA license, and her LPN license.

As Lipinski was preparing to graduate high school, her parents separated and moved to different states. Due in part to the separation of her parents and her own breakup with a boyfriend, Lipinski attempted suicide. As a result, she was placed in treatment with a diagnosis of major depressive disorder amongst

4

other mental illnesses. Lipinski married a man who was on active duty in the military. In August 2012, after her husband was discharged from the Army, she moved to Florida to be closer to her family. Lipinski had a hard time finding employment and her marriage ended in divorce. The divorce exasperated her depression and compounded her mental health issues culminating in her second attempted suicide. The suicide attempt resulted in Lipinski being Baker Acted and placed into mental health treatment.

Despite her personal hardships, bouts with depression, mental illness, and physical disability, Lipinski set out to achieve her goal in becoming a licensed practical nurse. She enrolled in an Emergency Medical Technician (EMT) training program; however, she could not pass the written tests and eventually had to withdraw from the program. She then enrolled in the nursing program at Cambridge Institute of Allied Health and Technology. She received her CNA and started working in the nursing field. In 2020, she obtained her Licensed Practical Nurse (LPN) diploma. Shortly after passing the nursing exam, she began her nursing career working at Orlando Regional Medical Center (ORMC). Lipinski underwent back surgery on June 24, 2016, for a laminectomy and to remove a tumor that was wrapped around her spinal cord. The tumor was unexpectedly discovered while trying to determine the cause of her chronic back pain. She could not work due to the surgery and condition.

After a lengthy recovery, Lipinski started working at Brookdale Nursing Care, a Senior Living center in Orlando and Tampa. She then worked as a nurse

in the Neuro unit at BayCare. Lipinski left BayCare due to the long hours, short-handed staff, and increased strain on her back. She briefly worked at the Zephyrhills Correction facility until she received a position as an LPN with NaphCare.  Through NaphCare, Lipinski was assigned to duties as a jail nurse in the Falkenberg Road Jail in Hillsborough County. NaphCare provides nursing services to correctional institutions. Despite NaphCare employees being required to have close contact with jail inmates, no training was offered to employees on how to work in the jail and interact with prisoners.

Lipinski currently lives with her mother and brother, Adam, in Minneola, Florida. After her arrest, Lipinski worked as a farm hand on a family farm. Due to her current mental health conditions and worsening physical condition, she is unable to work. Lipinski is under the care of doctors and mental health professionals for her physical disability, mental illnesses, and is focused on her recovery. (Exhibit 2). She strives to live a meaningful life and be a productive member of society. She has been compliant with the conditions of her pre-trial release and has cooperated with the Government.

    2. *Autism Spectrum Disorder and Mental Illness*

Lipinski suffers from several mental health and developmental disorders on the DSM-5. She is diagnosed with Autism Spectrum Disorder (Aspergers), Generalized Anxiety Disorder, Persistent Depressive Disorder, Intermittent Major Depressive Current Episodes, and posttraumatic stress disorder. Lipinski has been under the psychological care of Dr. Ahmadi-Davis since 2018, who has

6

engaged Lipinski in pharmacological treatment. Lipinski has been receiving therapeutic counseling under the care of Jamie Barrett M.S., LMHC at Total Life Counseling. (Exhibit 3). According to LMHC Barrett, Lipinski has been compliant with her extensive treatment plan to combat her multiple DSM-5 diagnosis. Lipinski is comfortable with Barrett as a treatment provider and has stated that the treatment has helped her to cope, recognize, and respond in a more positive manner. With continued treatment, Lipinski has a good prognosis.

Lipinski was subjected to an extensive mental health evaluation and testing administered by Dr. Marilyn Card PhD. (Exhibit 4). Dr. Card found that Lipinski has many behavioral characteristics of someone with autism which went undiagnosed. ASD contributes to her struggles with mental health and decision making. ASD is a neurodevelopmental disorder that presents itself in early childhood. According to the Diagnostic and Statistical Manuel of Mental Disorders (DSM-5-TR), autism spectrum disorder is characterized by persistent deficits in social communication and social interaction across multiple contexts, including skills in developing, maintaining, and understanding relationships. Am. Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders: DSM-5* 31,32 (5th ed. 2013). Although ASD presents in the early stages of childhood for many individuals, the symptoms of ASD are not apparent until a little bit later in life when "social demands exceed their limited capacity." The symptoms of ASD "cause a clinically significant deterioration in social and occupational settings and in other important areas of habitual functioning."

Marc Peraire, *Characterization of Autism Spectrum Disorder Inside Prison,*
Journal of Spanish Prison Health 31 (2023).

Dr. Card found that Lipinski's cognitive ability was in the low average
range of intellectual functioning. (Card 5). She opined that Lipinski has
deficiencies in executive function which includes impulse, control, social
behavior, problem solving, and behavioral regulation. (Card 10). She has
determined that Lipinski has an overall significant impairment in her executive
functions affecting her decision making, planning, organizing her thoughts,
memory, transitioning from tasks, and her ability to hold and process
information. (Card 15). Additionally, she struggles with systematic problem
solving to support appropriate self-regulation. Dr. Card attributes her mental,
cognitive, social, and behavioral deficiencies to ASD. During the clinical
interview, Dr. Card identified that Lipinski was easily manipulated. She found
that Lipinski "struggle(s) with picking up nonverbal cues and social cues," which
makes an individual more susceptible to being taken advantage of.

Lipinski's history demonstrates that she is desperate for attention,
extremely susceptible to manipulation and easily taken advantage of. Prior to
meeting Dukes, Lipinski was involved with a man who convinced her he was in
love with her and would take care of her.  She was manipulated into buying him
a car and inviting him into her home. That person in turn stole her car, money,
and other possessions. While she worked at the jail, multiple inmates gave her
the attention that she longed for which resulted in her engaging in inappropriate

(non-criminal) conversation with them. Shortly thereafter, she met Seneca Dukes. He gave her attention and showed her affection. Dukes seduced Lipinski and used friendship and affection to further his criminality.

    3.  Nature and circumstances of the offense

        a.  *Relevant Facts*

In November of 2020, Michelle Lipinski began working as an LPN in the Falkenburg Road Jail. As a jail nurse, she would travel to units in the jail to assist inmates who had minor medical issues. Lipinski, who had little supervision, was often left alone with the male inmates. This gave the inmates an opportunity to make advances towards her and engage with her on a personal level, which resulted in her having inappropriate conversations with them. Neither the jail nor her employer provided her with training in dealing with inmates who were in jail for various crimes including. They provided her with no resources or instruction on what to do when confronted by inmates. Ultimately, the jail, through their lack of oversight, provided inmates with the ability to prey on Lipinski who was an "easy target".

Lipinski was exceptionally vulnerable to being influenced by the men who were showing her attention. One of the men who manipulated her, showed her attention, and ultimately convinced her to engage in criminal conduct, was Seneca Dukes. Dukes, unlike Lipinski, has an extensive criminal history and made Lipinski believe that he loved her. In response, Lipinski regularly filled his jail account with money to make telephone calls and to buy items from the

canteen. Through their "relationship", Dukes spent hours talking to Lipinski on the jail phones, making her believe that they were "together", and would be together once he was released. Dukes went as far as calling Lipinski his wife and introduced Lipinski to his "family". Although Lipinski believed it was real, Dukes would later brag that he did not care about her and admitted to using her to spend her money on him and do as he desired. Dukes gave her attention and took advantage of her low mental acumen and insecurities and used her in furtherance of his role in the underlining conspiracy.

Unbeknownst to Lipinski, Dukes and his friend Marty Benning conspired to bring illegal narcotics into the jail through Lipinski. As part of Dukes and Marty's scheme, Lipinski was introduced to the sister of Marty, Miriam Marti-Benning. Marti-Benning was recruited in part to gain the confidence of Lipinski in furtherance of the plan hatched inside the jail. Part of Marti-Benning's role was to pretend that she was Dukes' sister. Marti-Benning perpetuated the lies of Dukes and engaged in her own manipulation of Lipinski which included her befriending Lipinski, her texting and telling Lipinski how much Dukes loved her, talking about the future wedding, and then telling her how her brother needed her "help" bringing things into the jail. Like Dukes, Marti-Benning preyed on, lied to, and manipulated Lipinski ultimately psychologically coercing her to do what Dukes wanted.

On March 17, 2021, at the direction of Dukes, Lipinski met for the first time with Marti-Benning who introduced herself as Dukes' sister. As she was

instructed to do by Dukes, Lipinski introduced herself as Dukes' "wife". Marti-Benning provided Lipinski with a package which she was instructed to deliver to Dukes. Lipinski did not open the package or know the contents of the package when she delivered it. In the days that followed, Dukes, Marty, Gotay Hernandez, and Marti-Benning discussed prices, quantities of drugs, and timing for the next delivery without Lipinski's knowledge or participation. After her meeting with Marti-Benning, Dukes directed Lipinski to meet his "brother" in Polk County. Dukes instructed Lipinski, who was naïve to criminal activity, on what to say, what to receive, and where to meet him.  When Lipinski met him, Dukes was on the phone with her giving her instructions from the jail.  The manipulative and controlling nature of Dukes is evident on the recorded call. Without opening the package or knowing the contents, Lipinski delivered it to Marti-Benning as she was instructed.

On March 28, 2021, Marti-Benning and Dukes instructed Lipinski to take another package to him in the jail. When Lipinski informed Dukes that she might not be able to deliver him the package, he ordered her over jail calls to "make it happen," "no procrastinating," and to "make sure you get that to me asap."  Lipinski did as she was ordered to do. She was not aware of what was in the package, nor was she aware of who the package would ultimately go to. Despite knowing that the package could be dangerous, Marty, through Dukes and Marti-Benning, ordered that the package be delivered to Dukes because it was "already paid for". After Lipinski delivered the package, she messaged

Marti-Benning that she saw Dukes, telling her, "I love him to death."

On March 30th, Dukes called Lipinski and ordered her to put money in his account. He questioned her loyalty and asked her if there were other men she was talking to, causing Lipinski to cry. That morning an inmate suffered from a non- fatal overdose in the jail shower. Lipinski did not profit or receive any financial compensation through the conspiracy and in fact lost money because of her giving large sums to Dukes to keep him happy. Dukes, a career criminal, preyed on Lipinski who did what he asked to please him. He convinced her to give him money, give money to others, and to bring him "packages" into the jail.

Although the victim overdosed, he made a full recovery and has no aftereffects from his overdose. Lipinski, who did not know the package contained fentanyl, did not intend or know that anyone would or could be hurt by what she brought in. The guidelines make no distinction on the severity of the injury suffered by the person who has a non-fatal overdose. Punishing Lipinski the same way that one would be punished if the victim had permanent injury would not provide for a just sentence for her crime. Here, the victim knowingly and intentionally ingested drugs while in the jail. Lipinski, who has no criminal history, was not predisposed to sell, distribute, or smuggle drugs, particularly at her workplace. She had no intent for anyone to be injured and faces a lengthy prison sentence. It should be noted that had this individual not suffered from the non-fatal overdose, Lipinski would have been eligible for both the "safety valve" and for a reduction as a "zero-point offender".

After learning of the overdose, Dukes and Marti-Benning gave Lipinski instructions on what to say if questioned by law enforcement. Understanding the gravity of the circumstances, she did not listen to them; instead, when Lipinski was confronted by law enforcement, she admitted her involvement, took responsibility for her actions, and began cooperating immediately. Lipinski explained her involvement and identified the other individuals involved. She described the packaging, identified photographs, and explained how she brought them into the jail. She explained how the cash app was used to get money to Marti-Benning, and ultimately how she was able to meet with Dukes to deliver the packages. Her cooperation led to the indictments and arrests of the codefendants and has continued through the sentencing of Dukes.

b. _Lipinski was manipulated by the codefendants into committing the offense and played a less significant role than her co-defendants._

Lipinski's role in the offense is significantly less in comparison to her codefendants. Lipinski was manipulated and induced to commit this offense by individuals intimately familiar with the criminal justice system who, unlike Lipinski, benefited from the scheme for a pecuniary gain. Lipinski was not predisposed to commit criminal conduct. She was used and deceived by the codefendants, particularly Dukes and Marti-Benning, who through their words and actions ordered her to engage in the offense conduct. Unlike the co-defendants, Lipinski has no history of drug abuse, no history of drug trafficking, and no significant criminal history.

But for the actions of Dukes and his cohorts, Lipinski would never have been in the circumstance she finds herself in today. Dukes, Marty, and Marti-Benning have made a career of preying on individuals for the purpose of committing and furthering their own criminal activity. As a female nurse with low self-esteem, intellectual disability, ASD, and mental illness, Lipinski was vulnerable and an easy target for these criminals who exploited her and took advantage of her disabilities. Had Lipinski been educated prior to being placed in the system or more closely supervised while in the in the jail, she would not have committed this offense.

Lipinski's involvement was due in part to her mental disability and the control that Dukes had over her. She was extremely vulnerable to the influence and pressure and ultimately engaged in activity that she was not predisposed to commit.  As is evident in the recorded phone calls, text messages, and letter that he wrote her, Dukes was manipulative and persuasive, preying on Lipinski's weaknesses and her desire to be wanted. Lipinski was not involved in the planning, scheming, or underlying operation. Lipinski was not privy to the communications between the other co-defendants who lied to her about their relationship with each other and kept her in the dark about their drug trafficking within the jail. She did not know the supplier of the drugs, did not profit from the sale, was not involved in packaging, was not aware of what type of drugs were in the packages, nor the final destination of the drugs.

      c.  *Lipinski's ASD contributed to her commission of the offense and*

<u>*prevented her from fully realizing the gravity of her conduct.*</u>

A person with ASD like Lipinski is easily manipulated and is unable to grasp the gravity of her actions. While Lipinski's naivety and the fact that she was manipulated by Dukes does not excuse her conduct, it does show that her role in the offense was minimal as compared to the other codefendants. Unlike the codefendants, Lipinski did not go into this with the intent to commit criminal activity. The drug delivery was not her plan or purpose for being in the jail. Her willingness to follow directives of Dukes and the other codefendants was ultimately a result of the manipulation of a woman who should never have been left in a jail alone with hardened criminals. At the time of this offense, Lipinski was unable to see that her kindness was a vulnerability that can easily be taken advantage of. Her ASD diagnosis combined with her mental illnesses demonstrate maladaptive behaviors that are related to her mental health wellbeing. (Card 14). These mental defects caused her to be easily manipulated, struggle with performing activities of daily living, engage in meaningful relationships, and meet the demands of the community in which she lives.

Although it is understood that autism itself is not a factor in which a downward variance is granted, it may be allowed if the defendant suffers from significant medical history, such as reduced mental capacity, and the reduced mental capacity contributed to the offense. *United States v. Williams*, 553 F.3d 1073, 1085 (7th Cir. 2009). As such, the Court may consider Lipinski's cognitive

impairments and deficiencies to the extent that she did not fully understand the wrongfulness of her actions. Unfortunately, due to the diagnosis of ASD being overlooked until adulthood, Lipinski never received treatment for the disorder. Proper treatment could have helped her to understand how her brain functions in diverse environments and could have taught her how to mitigate improper responses to adverse stimuli, such as manipulation and coercion. Though Lipinski willingly agreed to pick up and deliver a package to Seneca Dukes, she lacked the volitional ability to understand the wrongfulness of such a decision.

Her inability to appreciate the consequences and the risks that come with her actions is evident by her history of lacking self-control in various circumstances, especially when those circumstances include individuals taking advantage of her. Lipinski's history shows that when she receives attention from individuals, especially from a romantic perspective, she becomes obsessed and willingly gives herself without thinking of possible adverse reactions. When an individual with ASD acquires obsessive ideation, they may not see or understand that the route to pursue those interests may be criminal in nature, which leads to a failure to understand the possible ramifications. Colleen Berryessa, *Brief Report: Judicial Attitudes Regarding the Sentencing of Offenders with High Functioning Autism*, Journal of Autism and Developmental Disorders, 2 (2016).

Lipinski had no intention of committing crimes when she became a nurse in the jail; however, the prison system presented her with scenarios that contributed to her commission of the offense. Lipinski was unable to understand

what behavior was appropriate in her professional setting. When working as a nurse in a detention facility for an individual with ASD, it is imperative that the structure of the environment remains intact. This was not the case at Falkenburg Road Jail. This facility was understaffed, and a detention deputy was not always available to be with Lipinski when she was making her rounds with inmates. This created a vulnerability in the system and, thus, a heightened vulnerability to Lipinski.

> d. _Lipinski's Acceptance of responsibility and cooperation with the Government lessens her role in the offense._

When law enforcement first encountered Lipinski, she admitted to her role and began to describe details about the commission of the crime along with the other participants. From the date of her arrest until the date that Dukes was sentenced, Lipinski cooperated with the Government in resolving her and their cases. She provided substantial assistance to the Government that ultimately resulted in the convictions of Dukes, Marty, and Hernandez. She also provided material information and cooperation against Marti-Benning which aided the Government in their prosecution of her.

Over a span of approximately two years, Lipinski met with agents and prosecutors multiple times in anticipation of a trial. She provided context for the text messages and telephones calls, identified exhibits, explained her role in the offense, and identified other possible codefendants. She provided physical evidence, including a letter that Dukes wrote to her in jail, identified herself and

others on recorded telephone calls, elaborated on the context of text messages that only she would know, and helped to lay out a timeline of events to assist in the prosecution of the codefendants.

Lipinski assisted the Government prior to the convictions of Marti-Benning, Seneca Dukes, David Marty, and Emmanuel Gotay. Although Marty and Dukes entered pleas the morning of their trial, she prepared for trial by studying text messages and jail calls for her testimony. She even drove into Tampa to testify as a witness before she was notified of the pleas of Dukes and Marty. At the request of the Government, she appeared at the Sentencing of Seneca Dukes and was ready to testify for the Government if called.

Considering her mental illnesses, this was a much greater task for her than for other people who provide cooperation. Coming to terms with the fact that she was being used and that Dukes' affections were not real presented a lot of emotional distress. For Lipinski to testify against Dukes at a jury trial and sentencing, in addition to providing the Government with information prior to trial, was especially significant considering her mental illnesses.

**B. The Need for the sentence imposed § 3553(a):**

    1. <u>The need to reflect the seriousness of the offense promote respect for the law and provide a just punishment § 3553(a)(2)(A)</u>

A sentence below the Guideline range would effectively reflect the seriousness of the offense, promote respect for the law, and provide just punishment. The purposes of § 3553 (a)(2)(A) are referred to as "retribution"

which is generally assessed according to two elements: the nature and seriousness of the crime, or harm threatened and the defendant's degree in culpability in committing the crime. Richard S. Frase, *Excessive Prison Sentences, Punishment Goals and the Eighth Amendment: "Proportionality" Relative to What"*, 89 Minn. L. Rev. 571,590 (February 2005). In Lipinski's case, the seriousness of her offense is mitigated by her role in the offense, her treatment, her cooperation with the Government, her lack of prior offenses, and the collateral consequence of her losing her ability to be a nurse.

The consequences that Lipinski has suffered provide for a just punishment for her criminal activity, as such any extended period of incarceration would amount to a punishment beyond what is just. Lipinski has suffered the loss of her employment, her professional license, and many of her civil rights. Her life as she knew it was destroyed.  The collateral consequences suffered by Lipinski would justify a downward variance. *see e.g.*, *United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993);  *United States v. Vigil*, 476 F. Supp. 2d 1231, 1235 (D.N.M. 2007) (finding variance appropriate where defendant was collaterally punished by loss of his position and reputation, widespread media coverage, and emotional toll of two lengthy public trials); *United States v. Samaras*, 390 F. Supp. 2d 805, 809 (E.D. Wis. 2005).

      2.   The need to afford for adequate deterrence and to protect the public § 3553(a)(2)(B-C).

There is no empirical evidence that suggests sentence length has a

deterrent effect on future crime. Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006). The Sentencing Commission has found that there is no correlation between recidivism and Guideline offense levels; thus, an offender with a low guideline range and one with a high guideline range would have the same rate of recidivism. US Sentencing Commission, *Measuring Recidivism: The Criminal Computation of the Federal Sentencing Guidelines*, 15 (May 2004). In fact, the offender with the lowest rate of recidivism is one who receives probation and fines only. *Id.* at 13; see also US Sentencing Commission, *Recidivism Among Federal Offenders: A Comprehensive Overview*, at 22 (March 2016).

Lipinski is a first-time offender who is receiving treatment for her diagnoses which contributed to her commission of the offense. As a result of her conviction, she lost her license and no longer has access to the jails. She had no predisposition to commit drug related offenses prior to her arrest and would not have engaged in the offense conduct if she were not in the jail. The loss of her ability to operate as a licensed practical nurse provides adequate protection for the public.

Since her arrest, Lipinski has been evaluated and is under the care of mental health professionals. Dr. Valerie McClain conducted a risk assessment on Lipinski to assess the likelihood of her reoffending. (Exhibit 5). According to Dr. McClain, Lipinski presents as a low risk to re-offend. McClain based her conclusion that Lipinski is a low risk to reoffend on her lack of significant

criminal history, the nature of the offense, her personal background, her cooperation with the government, and her current treatment. It is Dr. McClain's recommendation that Lipinski continue with mental health treatment including medication management and counseling.

Many autistic individuals, like Lipinski, are not capable of understanding how their actions could be detrimental to the livelihood of another person and how these actions will affect their own life. Since Lipinski was not diagnosed until after the incident, she was not capable of knowing how the jail atmosphere would negatively affect her on a psychological level. She was unable to recognize the unfavorable actions of others and how to appropriately conduct herself around them. Since receiving treatment for ASD, Lipinski has a better understanding of her actions and how to avoid criminal conduct. This lowers her risk of re-offending.

    3.   <u>The Need for Medical Treatment is the "Most Effective Manner" § 3553(a)(2)(D).</u>

The sentence imposed must ensure that "needed...medical care is provided in the most effective manner". 18 U.S.C. § 3553(a)(2)(D). The sentencing commission recognizes that physical condition may be relevant when determining if a departure is warranted. USSG § 5H1.4 p.s. Courts have considered various circumstances in which a departure was warranted based on a physical or medical condition. *See e.g. U.S. v. Alemenas*, 553 F.3d 27 (1st Cir. 2009): *U.S. v. Kemph*, 2009 WL 667413 (4th Cir. March 13, 2009); *U.S. v.*

*Duhon*, 541 F.3d 391 (5th Cir. 2008); *U.S. v. Martin*, 363 F. 3d 25 (1st Cir. 2004).

Lipinski has several substantial mental and physical health conditions that require specialized treatment. As provided in the PSR, Lipinski has been diagnosed with Autism/Aspergers, Major Depressive Disorder, ADHD, PTSD, General Anxiety Disorder, chronic lower back pain, dehydrated disks, arthritis, lordosis, a spinal tumor, high pulse rate, tachycardia, high cholesterol, obesity, endometriosis, migraines, insomnia. (PSR 60). She was recently evaluated by a neurosurgeon. On March 11, 2024, Lipinski had spinal decompression fusion surgery. While operating, the surgeon discovered that one disc was broken, and others had malformations. He installed screws and rods to stabilize her spine. The recovery from surgery is four to six weeks, but the healing is eight to twelve months. On March 15, 2024, while recovering from surgery, Lipinski was having trouble breathing. She went to the emergency room and was admitted with pulmonary edema. While being treated, doctors discovered she is also suffering from congestive heart failure and other heart issues related to a mitral valve deformity. She is currently under the care of a cardiologist who has recommended surgical intervention.

Lipinski is under an extensive treatment regimen in which she attends frequent medical visits and is prescribed multiple medications. (PSR 65). Removing Lipinski from her support structure, both family and doctors, will exacerbate her condition and subject her to harm. In consideration of all her medical conditions the cost to incarcerate Lipinski would be burdensome on the

BOP. Moreover, the BOP is not equipped to provide all the medical care and services that Lipinski requires. As time passes, her medical conditions will undoubtedly worsen as they have just in the last few months. A lengthy prison for a person with Lipinski's conditions could amount to the equivalent of a life sentence without her current treatment. Lipinski struggled considerably when taken out of her environment, which has led to significant deterioration in her mental and physical health. According to Dr. Card, Lipinski conveys symptoms of a lack of self-control and impulsiveness. In a prison setting, behaviors like this make it difficult to adapt to the environment, putting her at risk for inmate retaliation. Similarly, not having someone to encourage and redirect both her emotions and reactions to any given scenario can limit her ability for reform once released. Consistent psychiatric care is required for Lipinski to address and manage her multiple diagnoses.

Individuals who are diagnosed with ASD and mental illness benefit from multiple different therapy approaches, including but not limited to, individual and group behavioral therapy, pharmacotherapy, and, in some cases, brain stimulation therapy. Lipinski's doctors have recommended pharmacotherapy, upkeeping her current medications with continued observation and reassessment as to how her behaviors change and any need for readjustment to her prescriptions. Additionally, they have recommended both individual and group therapy, including Cognitive Behavioral Therapy, Choice Theory Reality Therapy, Rationale Emotive Behavior Therapy, and Eye Movement

Desensitization and Reprocessing Therapy. Lipinski has engaged in this therapy since her diagnosis and continues with this treatment under the care of LMHC Jamie Barrett to date.

When fashioning an appropriate sentence, the Court should consider a defendant's mental health condition, specifically a diagnosis of ASD, to determine if a defendant is more vulnerable to harm in prison based upon this condition. Lipinski's mental health conditions, notably her diagnosis of ASD, make her highly vulnerable in the prison population given her defects in social behavior and functioning, processing, reasoning, behavior regulation, inhibition, and social immaturity. (Dr. Card). Punishment for those with autism is complex, as anything excessive can have extremely detrimental impacts on the individual. "Excessive punishment can fuel anxiety and perhaps lead to greater and misdirected aggression." Christine Cea, *Autism and the Criminal Defendant*, St. John's Law Review, 88 St. John's L. Rev. 495, 525 (2014). Lipinski's diagnosis of ASD is intensified by her additional diagnoses of ADHD, PTSD, anxiety disorder, and persistent depressive disorder. Within the prison system, the compounding effect of these disorders puts her in a more vulnerable position when it comes to suicidal ideations, sexual victimization, harassment, and social isolation. Inmates with both autism and ADHD are subject to "more severe behavioral changes than inmates without this comorbidity." Both ASD and ADHD create incredible social deficits, making it difficult to understand the informal social hierarchies that exist within the prison system. The associated

24

risk of being exposed to intimidation and confrontation aggravates their limitations, leading to psychological regression and a higher chance of reoffending in the future. Marc Peraire, *Characterization of Autism Spectrum Disorder Inside Prison*, Journal of Spanish Prison Health, 33 (2023).

## IV.   CONCLUSION

The Defendant, Michelle Lipinski, respectfully requests that the Court grant the Defendant's Motion for a Downward Variance. Lipinski is a first-time offender with many mental health and medical conditions for which she is receiving treatment. She has demonstrated a positive adjustment on release and has a low likelihood of reoffending. She has cooperated with the Government and played a lesser role than her codefendants who coerced her to engage in this behavior. As such, a downward variance as requested would be sufficient, but not greater than necessary to achieve the goals of 18 USC § 3553(a).

Respectfully Submitted,

/s/ Anthony B. Rickman
ANTHONY B. RICKMAN, ESQUIRE
FL. BAR No. 13904
400 North Ashley Drive Suite 2100
Tampa, Florida 33602
(813) 999-0502
ARickman@therickmanlawfirm.com

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I electronically filed the foregoing with the

Clerk of Court by using CM/ECF System which will send a Notice of Electronic

Filing to Michael Sinacore, Assistant United States Attorney, 400 North Tampa

Street, Suite 2100, Tampa, Florida.